IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Builders Mutual Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 4:07-cv-2179-TLW |
| | ) | |
| Wingard Properties, Inc., a/k/a Wingard Properties; Brian J. Roberts; Christina K. Roberts; and Auto-Owners Insurance Company, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Builders Mutual Insurance Company ("Builders Mutual") filed this declaratory judgment action before this Court on July 16, 2007. (Doc. # 1). On November 20, 2008, Magistrate Judge Thomas E. Rogers, III entered an order staying the case. (Doc. # 44). The stay was lifted on October 6, 2009. (Doc. # 67). In October 2009, the underlying lawsuit was settled for $85,000. Builders Mutual and Defendant Auto-Owners Insurance Company ("Auto-Owners") each paid 50% of the $85,000 but reserved the right to contest allocation.

Auto-Owners filed a Motion for Summary Judgment on January 8, 2010. (Doc. # 72). Builders Mutual filed a Response in Opposition on January 21, 2010. (Doc. # 73). Additionally, on January 22, 2010, Builders Mutual filed a Motion for Summary Judgment. (Doc. # 74). Auto-Owners filed a Response in Opposition, (Doc. # 76), and a Reply, (Doc. # 77), on February 1,

2010. Wingard filed a Memorandum Regarding Summary Judgment on February 8, 2010. (Doc. # 79).

After review of the motions and evidence presented by the parties, this Court determined there were questions of fact which could not be resolved at summary judgment. Therefore, the motions for summary judgment were denied. (Doc. # 82). Additionally, this Court ordered the parties to attempt to resolve the dispute through mediation and to submit memoranda addressing whether this Court still had jurisdiction over this action in light of the amount in controversy. (Doc. # 82). The parties were unable to successfully mediate this dispute, and both parties submitted memoranda asserting that this Court still had jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a). The Court held that amount in controversy requirement had been satisfied and set the case for trial. (Doc. # 85). At the direction of the Court, (Doc. # 91), the parties filed joint stipulated facts. (Doc. # 92). Certain facts remained in dispute. This Court adopts and incorporates those facts to which the parties have jointly stipulated and will make a determination as to all matters which remain in controversy. A bench trial was held on September 7, 2010.

Having considered the evidence and arguments presented by the parties at trial, this Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any Findings of Fact constitute Conclusions of Law, they shall be so regarded.

## I. Background

As noted, the underlying lawsuit to this declaratory judgment action, which was filed in state court, was settled. In summary, Brian and Christina Roberts asserted that their property had sustained substantial water and moisture damage that resulted from numerous construction defects. The Roberts asserted that these defects were the fault of their general contractor/developer, Wingard Properties, Inc., (Wingard). The suit was settled for $85,000, but Auto-Owners and Builders Mutual reserved the right to contest allocation. Auto-Owners argues that it should not be liable for any percent of the $85,000, while Builders Mutual contends that the 50/50 split is equitable.

At summary judgment, Auto-Owners and Builders Mutual conceded that an "occurrence" is present and that the "occurrence" resulted in "property damage." Therefore, the remaining issues in dispute for this Court to decide are when the "occurrence" and "property damage" took place, when the damage ended, and how the settlement should be split between the parties in light of the Court's determination of the aforementioned. Additionally, both parties conceded that the South Carolina Supreme Court has adopted a modified continuous trigger theory of liability.

## II. Stipulations

1. Builders Mutual filed this insurance coverage declaratory judgment action on 16 July 2007, against the Defendant and Counter-Plaintiff, Wingard Properties, Inc. a/k/a Wingard Properties ("Wingard Properties"); the Defendants, Brian J. Roberts and Christina K. Roberts (the "Drs. Roberts"); and Auto-Owners.

2. This insurance coverage declaratory judgment action arises out of South Carolina State Court construction defects/faulty workmanship litigation the Drs. Roberts filed against Wingard Properties. *See Brian J. Roberts and Christine K. Roberts v. Wingard Properties, Inc.* (Horry County Court of Common Pleas, Civil Action No. 2006- CP-26-5413, filed November 3, 2006) (the "Underlying Litigation").

3. Auto-Owners asserted an insurance coverage declaratory judgment counterclaim/cross-claim.

4. In May 1999, the Drs. Roberts retained Wingard Properties to build them a two-story single family residential dwelling (the "Roberts Residence"), to be located at 8706 North Ocean Boulevard, Myrtle Beach, South Carolina.

5. Wingard Properties was the general contractor/developer for construction of the Roberts Residence.

6. On 24 May 1999, Wingard Properties obtained a building permit from the City of Myrtle Beach, South Carolina authorizing the construction of the Roberts Residence.

7. On April 13, 2000, Wingard Properties obtained a Certificate of Occupancy from the City of Myrtle Beach authorizing residential occupancy for the Roberts Residence.

8. In Spring 2000, shortly after the Drs. Roberts moved into their home, they experienced a water leak from the beach side upper deck into the sunroom, as well as, water intrusion from certain windows located in the kitchen and in the living room.

9. After Wingard Properties made the repairs, the Drs. Roberts testified there were no problems thereafter and they believed their moisture intrusion problems had been fixed.

10. In 2004, Dr. Brian Roberts contacted Wingard Properties to repair the home's exterior door jambs as the door jambs were rotting down at the lower portion where the jamb met the deck.

11. Dr. Brian Roberts testified he again contacted Wingard Properties about the rotting door jambs on or about 8 March 2005.

12. On or about 8 October 2005, when the Drs. Roberts returned from vacation, they discovered water intrusion into the Roberts Residence in the second floor bedrooms and at the first floor windows.

13. In November 2005, the Drs. Roberts retained R.V. Buric Construction Consultants, PC to inspect their home and evaluate the water intrusion problems and RV Buric conducted two site inspections.

14. RV Buric issued a written report to the Drs. Roberts detailing its investigation and setting forth its recommendations for remediation and repair of the various construction defects found in the Roberts Residence. The *RV Buric Report* was signed by Ronald E. Wright.

15. The *RV Buric Report* stated that incomplete and incorrect work from Wingard Properties' original construction led to water intrusion and damage to the Roberts Residence.

16. Mr. Wright testified that incomplete and incorrect work from Wingard Properties' original construction could have been leading to water intrusion and damage to the Roberts Residence.

17. The construction defects at the Roberts Residence included (a) failure to install head flashing at either window and door heads; (b) thresholds improperly terminated at jambs; (c) building paper improperly installed; (d) building paper improperly interfaced with base flashing; (e) cement fiberboard improperly fastened; (f) cement fiberboard in contact with band board

flashing; (g) sealant improperly installed or missing altogether; and (h) insulation either not continuous or not installed.

18. RV Buric recommended Dr. and Mrs. Roberts, among other things, (a) remove and replace all of the cement fiberboard cladding, (b) remove and replace all water-damaged second-floor door units with code compliant doors (including removal/replacement or repair of all attendant flashing, structural components, *etc*.), (c) install flashing at all windows and doors throughout the Roberts Residence, (d) remove and replace decking, and (e) remove and replace all water-damaged interior finishes.

19. The Roberts Residence did not have any flashing installed above or around the windows or the doors which allowed water to get back behind the exterior cladding.

20. The Roberts Residence did not have any kick-out flashing which allowed water to get back behind the exterior cladding.

21. The flashings and building paper at the Roberts Residence were improperly lapped which allowed water damage to occur to the underneath sheathing and framing.

22. The building paper and/or the flashing should be weather-lapped, where any succeeding layer should be on the outside of something below it so that any water coming down is always getting to the outside.

23. The exterior siding improperly in contact with the home's horizontal building components and roof areas.

24. The construction defects and the faulty workmanship problems at the Roberts Residence existed from the time of the original construction, except where it appeared there had been some repairs.

25. The Drs. Roberts sued Wingard Properties in South Carolina State Court for negligence, breach of express and implied warranties, and breach of contract.

26. Builders Mutual and Auto-Owners jointly provided Wingard Properties with a legal defense in the Underlying Litigation.

27. The Underlying Litigation was settled with Builders Mutual and Auto-Owners splitting Wingard Properties' $85,000.00 share of the settlement on a 50/50 basis.

28. On 27 April 1999, Auto-Owners issued Wingard Properties a commercial general liability insurance policy, pursuant to Policy No. 934616-36041956-99, with an initial policy period of 27 April 1999, until 27 April 2000.

29. The Auto-Owners insurance policy was subsequently renewed through 27 April 2003.

30. Wingard Properties was uninsured from 27 April 2003, until 1 May 2003.

31. On 1 May 2003, Builders Mutual issued a commercial general liability insurance policy, pursuant to Policy No. CPP 0015855 00, to Wingard Properties with an initial policy effective period running from 1 May 2003, until 1 May 2004.

32. The Builders Mutual policy was subsequently renewed through 1 May 2007.

33. Builders Mutual and Auto-Owners agree that the depositions of Dr. Brian J. Roberts, Dr. Christine K. Roberts, and Ronald E. Wright constitute the factual testimony in this matter.

Additionally, all exhibits were admitted without objection and were stipulated to and agreed upon in the parties' Joint Stipulated Facts. (Doc. # 92).

### III. Findings of Fact

*Beginning of the Injury-in-Fact*

1. From the evidence of record presented at trial, this Court finds that the damage in fact first occurred in May of 2000. The evidence pertinent to this Court's finding is outlined below.

2. As stipulated and as evidence at trial revealed, in the Spring of 2000, the Roberts experienced a water leak from the beach side upper deck into the sunroom, as well as water intrusion from certain windows located in the kitchen and in the living room.

3. Dr. Roberts was asked when he became aware or involved in problems with his residence. His deposition reads:

> Q.: Your wife mentioned some things that came up right after you moved in.
>
> A.: Right. There was one issue. The ceiling of our sunroom, which could also be referred to as the floor of our deck, leaked water into the sunroom, and it was repaired shortly after we moved in and then repaired again, and that problem was completely resolved by that second repair. That, essentially, involved water coming through the ceiling in about the middle of the sunroom, you know, that location.
>
> (Ex. 11, Dep. of Brian J. Roberts, at p. 26).

5. Dr. Roberts was then asked, "So as far as you knew, at least at that point, the two repairs had addressed that issue?" Id. at 28. He responded, "Yes. There were no problems thereafter with that. That seemed to fix it completely." Id.

6. The deposition of Dr. Roberts also reveals that there were problems with some of the windows during this time. Dr. Roberts stated, "in that same time frame, a couple of windows leaked, and I know that David Herring addressed those, and that seemed to have stopped it." Id. at 28-29.

7. This Court finds that while Dr. Roberts opined that he believed the repairs fixed the initial problems completely, there is little evidence other than the statements of the Roberts, the homeowners who have no expertise in construction, to indicate that the problems had in fact been fully remedied.

8. As stipulated to by the parties, in 2004, Dr. Brian Roberts contacted Wingard Properties to repair the home's exterior door jambs as the door jambs were rotting down at the lower portion where the jamb met the deck.

9. As stipulated to by the parties, Dr. Brian Roberts testified that he contacted Wingard Properties about the rotting door jambs on around March 8, 2005.

10. As stipulated to by the parties, around October 8, 2005, the Roberts returned home from vacation to find water intrusion in the second floor bedrooms and first floor windows.

11. The parties have stipulated to the existence of several building defects which allowed water intrusion. For instance, the parties stipulated that the Roberts Residence did not have any flashing installed above or around the windows or the doors which allowed water to get back behind the exterior cladding, and the residence did not have any kick-out flashing which allowed water to get back behind the exterior cladding.

12. As stipulated to by the parties, the construction defects existed from the time of original construction, except where it appeared there had been some repairs.

13. Mr. Ronald E. Wright, P.E., is a civil engineer and the chief operating officer of R.V. Buric. R.V. Buric is a multi-services consulting firm that works in the fields of project management and construction, among other areas. When asked if he had any opinions as to why the problems "would have manifested themselves so suddenly five years after construction," he responded:

> I'm not sure that they did manifest themselves that quickly. I think the issues we've talked about were all ones that were there from original construction, except where it appeared there had been some repairs. But the way the flashing and the building wrap are not properly lapped and the lack of some of the kick out flashings, those types of things would have been from original construction. It could have been leading water into the walls of the building itself but not gotten all the way to the interior yet.
>
> . . .
>
> Very well could be that with the sunroom and the way in which the door thresholds were, could have been something that it was holding. And then the sealant finally failed in a place where over top a specific area and allowed water to come in. Now, as far as how extensive the amount of water coming in, I'm not aware of how much came in and how far it went.
>
> (Ex. 14, Dep. of Ronald E. Wright, P.E., at p. 86-87).

The deposition then reads:

> Q.: Okay, But would you think that for enough water to come in to soak the carpets that that shouldn't be something that just happens suddenly; that that would be something you would see evidence of over a period of time?
>
> A.: Not necessarily. I mean, it would depend on the actual weather that occurred. Houses are supposed to be built to be able to take up to the hurricanes, if they're in the coastal environment. So I wouldn't call that necessarily an unusual weather event, in terms of how the house should still perform. But if it's a house that's not correctly built, that kind of weather event may be more than what it could

withstand because of how it was improperly built; in which case, water would come in because of that.

Id. at 87.

14. At trial, a report created by R.V. Buric Construction Consultants based upon review and documentation of the conditions at the Roberts residence was entered into the record. (Ex. 14). In this report, R.V. Buric concluded, "Incomplete and incorrect work from original construction by Wingard led to water intrusion and damage to residence." Id. at 6.

*End of the Injury-in-Fact*

15. From the evidence of record, this Court finds that the damages continued unabated from May 1 of 2000 through the entire insurance coverage period provided by Builders Mutual.

16. There is no evidence of record from which this Court can conclude that the damage from which this litigation arose was remedied before settlement of the underlying lawsuit. Neither party presented any direct evidence on this point nor is there circumstantial evidence on which this Court could so find. The attorney for Builders Mutual noted in his closing argument that damages continued through Auto-Owners' policies, through Builders Mutual's policies, and apparently into the time after Builders Mutual's policies ended in May of 2007.

17. This Court finds no evidence supporting a date in the record at which damages actually stopped. Therefore, the Court finds that the damages, in effect, ceased at the date of settlement.

18  This Court finds that for the purposes of calculating an equitable distribution of damages between Builders Mutual and Auto Owners, the damages ended on October 23, 2009, or the date at which the settlement agreement was signed between the Roberts and Wingard. Previous

litigation in the Fourth Circuit reveals that the settlement date has been used to mark the end of the period of damages. Stonehenge Eng'g Corp. v. Employers Ins. of Wausau, 201 F.3d 296 (4th Cir. 2000). However, in the instant litigation, using the settlement date as the end date encompasses a period of time under which Wingard had no insurance. Therefore, to allocate the entire $85,000 between Auto Owners and Builders Mutual will require this Court to apportion payment of damages to an insurance company for time at which it was not actually on the risk. The attorneys for both parties did not strenuously oppose the use of this date at the bench trial. At certain times, both counsel recognized the efficacy of using this date to apportion damages. Further, neither party noted an objection to the use of this date based on the fact that it was not on the risk for a portion of the time. Indeed, this was a date suggested by Auto Owners.[1]

*Pro Rata Share between Parties*

19. Auto-Owners provided coverage to Wingard from April 27, 1999 to April 27, 2003. Damages began May 1, 2000. Therefore Auto-Owners was on the risk for thirty-five months and twenty-six days, rounded up to thirty-six (36) months.

20. Builders Mutual provided coverage to Wingard from May 1, 2003 to May 1, 2007. Therefore, Builders Mutual was on the risk for forty-eight (48) months.

21. Wingard had no insurance from May 1, 2007 to October 23, 2009, or for twenty-nine months and twenty-two days, rounded up to thirty (30) months.

22. The time over which to allocate the risk is 114 months, from May 1, 2000, to October 23, 2009. Auto-Owners' initial share is 36/114, or 31.58%. Builders Mutual's initial share is 48/114,

---

[1] Wingard was not a party at the bench trial, and neither insurance carrier implicated Wingard's shared liability for the $85,000.

or 42.11%. Wingard was uninsured for 26.31% of the period. Therefore, the initial allocation of the $85,000 is $26,843.00 to Auto-Owners, $35,793.50 to Builders Mutual, and $22,363.50 as uninsured.

23. This Court has been asked by the parties to allocate the entire $85,000 between Auto-Owners and Builders Mutual only. Therefore, this Court determines that the most equitable manner to distribute the amount attributed to "uninsured time" is to divide it evenly between the two insurance carriers.[2] The attorney for Builder's Mutual stated in his closing argument that if there is a reallocation, then the parties should split the uninsured time evenly. Accordingly, Builders Mutual is liable for $46,975.25 and Auto-Owners is liable for $38,024.75.

24. The parties noted that each has already paid $42,500 of the $85,000 settlement. Therefore, Builders Mutual is to pay $4,475.25 to Auto-Owners.

   **IV.    Conclusions of Law**

*Choice of Law*

Where jurisdiction is premised upon diversity, a district court applies the substantive law of the forum state to resolve a Plaintiff's state law claims. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 498 (1941); Brown v. American Broadcasting Co., 704 F.2d 1296, 1299 (4th Cir. 1983). Historically, South Carolina courts have held that a contract of insurance is governed by law of state in which application for insurance was made, policy delivered, and contract formed. Unison Ins. Co. v. Hertz Rental Corp., 436 S.E.2d 182 (S.C. App. 1993), *reh'g denied*.

---

[2] Again, this Court notes that Auto-Owners argued for the use of this date and Builders Mutual did not strenuously object, so long as the uninsured time was split evenly between the parties. Choosing the termination date of Builders Mutual's policy would have avoided the problem of allocating liability for time off the risk to an insurance carrier. However, it would have led to an improper conclusion, namely that the period of damages ends when the last insurance policy expires. Additionally, there is no evidence of record to suggest the damages ended on this date, and the parties did not persuasively argue for the use of this date.

According to a review of the policy and declarations page of the CGL policies in this case, Wingard is an entity located in South Carolina. Thus, the insurance was intended to cover the "lives, property, and interests" of people and property located in South Carolina. Pursuant to Unison and its progeny, as well as SC Code Ann. § 38-61-10, South Carolina law applies to this matter. See also, Sangamo Weston, Inc. v. National Surety Corp., 414 S.E.2d 127 (S.C. 1992). Additionally, neither party has objected to the application of South Carolina law or suggested that the law of another state applies.

*South Carolina's Modified Continuous Trigger Doctrine*

Joe Harden Builders v. Aetna Casu. & Sur. Co., 486 S.E.2d 89 (S.C. 1997) is the seminal case setting forth South Carolina law regarding the trigger of a general liability insurance policy. In Joe Harden, the Supreme Court of South Carolina held that "coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage." Id. at 91. "Further, this theory of coverage will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage." Id.

Additionally, the Fourth Circuit noted:

> In Joe Harden, the South Carolina Supreme Court held that in the case of progressive property damage, such as property damage caused by faulty construction, the time of the "occurrence" for purposes of a standard commercial general liability policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged, *i.e.,* injury-in-fact, and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact through the time of the progressive damage.

Stonehenge Eng'g Corp. v. Employers Ins. of Wausau, 201 F.3d 296, 304 (4th Cir. 2000).

***Allocation of Costs***

The Fourth Circuit in Spartan Petroleum Co. v. Federated Mut. Ins. Co., 162 F.3d 805 (4th Cir. 1998) explained, "[W]e follow those courts that have concluded that the injury-in-fact/continuous trigger, such as the one adopted in *Joe Harden,* requires both pro rata allocation and allocation to the insured for any periods of the progressive damage during which it was self-insured." Spartan, 162 F.3d at 812.[3] The Fourth Circuit explained further:

> A court looks to the periods covered, not to the rate or degree of damage occurring during each period (which would involve even more difficult proof problems). This is the approach that Joe Harden suggests, when it explains that the injury-in-fact/continuous trigger "will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage."
>
> Id. (quoting Joe Harden, 486 S.E.2d at 91).

The Fourth Circuit then noted, "Pro rata liability is the 'logical corollary' of the injury-in-fact trigger . . . ." Id. (citations omitted). Finally, it explained that an insurance company's liability "would be a proportion of the [settlement] equal to the period [its policy] covered, divided by the total period of damages." Id. at 813.

---

[3] For reasons previously explained and unique to this specific litigation, this Court apportioned the time Wingard was self-insured evenly between Auto-Owners and Builders Mutual.

## **CONCLUSION**

For the reasons set forth herein, Auto-Owners is entitled to payment of $4,475.25 from Builders Mutual.

**IT IS SO ORDERED**.

s/Terry L. Wooten
TERRY L. WOOTEN
United States District Judge

September 28, 2010
Florence, South Carolina